United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| WALTER STEPHENS, | NO. C 03-3713 JW |
| Petitioner, <br> v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| C.A. TERHUNE, in his capacity as head of the California Department of Corrections | |
| Respondent. | |

## INTRODUCTION

This matter is now before the Court for consideration of Walter Stephens' ("Petitioner") petition for writ of habeas corpus under 28 U.S.C. § 2254 concerning his 1999 conviction in the Santa Cruz County Superior Court. For the reasons set forth below, the petition is DENIED as to all claims.

## BACKGROUND

### I.  Case History

On November 9, 1999, a jury found Petitioner guilty of second-degree murder pursuant to Penal Code § 187, and guilty of personally discharging a firearm in the commission of that offense pursuant to Penal Code § 12022.53(d). Petitioner was sentenced to 15 years to life in prison for the murder count, and a consecutive term of 25 years to life on the sentencing enhancement. Petitioner filed an appeal, which

1  was denied by the California Court of Appeal on February 28, 2002. The California Supreme Court
2  denied his petition for review on May 15, 2002. Petitioner then filed a writ of habeas corpus with the
3  California Supreme Court, which was denied on May 12, 2004.
4  Petitioner filed the instant petition for a writ of habeas corpus with this Court on August 8, 2003, as well as
5  an application to hold the federal habeas petition in abeyance pending the exhaustion of potentially
6  dispositive claims in state court. The application was granted, and upon rejection of his claims by the
7  Supreme Court of the State of California, Petitioner filed his amended habeas corpus petition in federal
8  court on May 21, 2004.
9       This Court issued an Order to Show Cause to Respondent as to why the petition should not be
10 granted; and Respondent addressed the merits of the petition in a timely response. Petitioner then filed a
11 traverse on March 7, 2005, and a request for an evidentiary hearing on March 21, 2005, which was denied
12 by this Court on April 14, 2005.
13      Petitioner raises three challenges to his conviction by asserting the following claims: (1) ineffective
14 assistance of counsel; (2) improper exclusion of evidence by the trial court; and (3) prosecutorial
15 misconduct.

16 **II.**    **Facts**

17      In July 1997, Petitioner bought a house on Lompico Road, which is located in a mountainous area
18 of Santa Cruz County. Petitioner bought the house from Mike and Robin Moreland, and was aware at that
19 time of purchase of a boundary dispute between the Morelands and their neighbor, Bob Hall ("Hall"), the
20 victim. Hall's position was that the driveway leading to Petitioner's house was in the same area as Lilac
21 Avenue, a road that appeared on an old subdivision map. Surveyors had told Hall that this was a public
22 access road. Hall and Petitioner each claimed ownership of the culvert between their parcels of land.
23      In July 1997, Petitioner dug up the culvert between the parcels of land. It was at this time that
24 Petitioner first met Hall, who confronted him regarding the disputed land. Petitioner informed Hall that he
25 had indeed dug up the culvert and informed Hall that it was on his property. Hall replied that the driveway
26 was actually Lilac Avenue, for which he had a survey done. Petitioner asked Hall if the survey had been
27 recorded. When Hall replied that it had, Petitioner characterized Hall as a liar because he knew that it had

not. After speaking with Hall, Petitioner installed a concrete and steel pipe barricade across the driveway to prevent vehicles from entering.

In a letter dated October 21, 1997, the county Fire Chief informed Petitioner that he had to remove the barricade for public safety reasons. Petitioner viewed the letter as a form of harassment. He did not remove the barricade until January 1998 when the county planning department told him that he would not get a permit for a shed unless the barricade was removed. Petitioner was also informed that the presence of the barricade would affect his homeowner's insurance and mortgage.

On August 28, 1998, Petitioner decided to rent a backhoe and take the culvert out of the ground so that Hall could not get access. When Petitioner started to work, Hall laid down in the culvert. When Petitioner moved to a different part of the culvert, Hall blocked him yet again. They went back and forth about 15 times. At one point Hall got his foot caught on the bucket. Petitioner asked his friend and tenant, Sue Friedrich, to call the police, who took a report. An emergency vehicle arrived to take Hall to the hospital. Petitioner did not tell the officer that there was physical contact between the backhoe and Hall.

Petitioner twice saw Hall at the mailboxes shared by residents on Lompico Road. Petitioner claims that Hall was opening his mailbox. Petitioner contacted the police, but they would not do anything until something was taken from the mailbox.[1]

Sometime during the weekend of November 14 to 15, Petitioner saw Hall watching him through the trees from Hall's property. Petitioner thought that Hall was "stalking" him. On November 16, Petitioner was served with a summons and complaint in the civil action entitled Hall v. Stephens, in which Hall sued Petitioner over the backhoe incident for property damage, trespass, assault and battery, and nuisance. Petitioner claimed that he was not upset about the lawsuit, because he believed it would be an effective way to settle the boundary dispute.

Friday, November 20, 1998, was Petitioner's day off from work. Sunrise that day was at 6:49 a.m. It was dark when Petitioner awoke at 6:00 a.m. He dressed and went to the front porch to urinate.[2]

---

[1] Hall's brother later provided the prosecutor with mail addressed to Petitioner and his tenants, which was found in Hall's home after his death. Hall had also been compiling information about Petitioner and his tenants, including financial information and where Sue Friedrich's children went to school.

[2] Petitioner testified that to reach the bathroom from the front of his house one had to walk through his tenant's bedroom. Therefore, Petitioner's practice was to "relieve [himself] in the morning" from the front porch. (Ex. B, RT 3355-56.)

3

Petitioner heard a noise like gravel on asphalt coming from the driveway. He assumed that it was Hall. Petitioner was frightened, because he could not see what Hall was doing. Petitioner went to his back room, got his revolver and loaded it.

Since Petitioner would be exposed at the front porch, he exited from the back of the house and peeked around the corner. He saw a person he thought was Hall. The person was about 50 feet away and walking away from Petitioner's house toward the culvert. Petitioner yelled, "What the hell do you think you're doing?" Hall turned around, raised his arm, and said either, "I'm not going to let you . . . ." or "You're not going to get away with this . . . ." Petitioner saw a "glint" from what he thought was a gun barrel in Hall's hand. He knew Hall owned guns and had heard that Hall was a good shot. Petitioner believed that Hall was going to shoot him. Petitioner was scared and he instinctively fired two shots at Hall. Hall remained standing. Petitioner ran at full speed toward Hall. When he was about 12 feet away from Hall, he realized that what he thought was a gun turned out to be Hall's chrome thermos. Hall threw the thermos at him from about six feet away, and hit Petitioner across the bridge of his nose. The blow stunned him, but Petitioner did not lose consciousness.

Petitioner believed that Hall had set him up and that he had played into Hall's hands. Petitioner believed that he was "in the wrong" and since Hall now was entitled to kill him, he had to defend himself or die. Petitioner knew that it was wrong to shoot Hall because he was unarmed, so he used his gun as a club.

At about 10:30 a.m., one of Hall's co-workers called the sheriff's department and asked a deputy to check on Hall, since he had failed to show up for his last day of work, which included an exit interview at 8:30 a.m., as well as a farewell luncheon with co-workers. At about 11:20 a.m., Deputy Sheriff Gordon Dillard arrived at Hall's house. The front door was ajar, lights and a radio were on, and a fire was burning in the fireplace. Hall's truck was in the driveway, but Hall was not present. Since there were no signs of violence, Deputy Dillard left the residence at 11:44 a.m.

At about 1:30 p.m., one of Hall's co-workers asked a deputy to go to Hall's house again. Deputy Dillard responded at 2:17 p.m. and Deputy Steve Watson about a minute later. The deputies entered Hall's house together and did not find him there. Deputy Watson then checked the wooded area surrounding the house. As he walked along a path, he saw another residence. There was thick, black

smoke coming up through some trees from a clearing behind the house. Deputy Watson heard a dog barking and a man's voice telling the dog to be quiet. Watson then saw Petitioner and a dog walking toward him. Petitioner said, "You're here because of my fire, aren't you? I'm burning some paint cans." Deputy Watson told Petitioner that burning paint cans was illegal, but that he was looking for Hall, who had not shown up for work that day. Deputy Watson asked Petitioner if he had any idea where Hall might be, or whether he had beard any gun shots, or strange noises. Petitioner said, "no," and seemed unconcerned about Hall's whereabouts. Petitioner said that he had seen Hall about a month ago and mentioned that they were having a boundary dispute. It seemed odd to Deputy Watson that Petitioner had not seen Hall for a month, since they were having a dispute and neighbors are usually aware of each other. Petitioner steered the conversation away from Hall and back to his fire. While they were talking, Deputy Watson could see the smoke from a clearing behind the trees. There was a noticeable odor of something synthetic and something that "didn't smell quite right."

Deputy Watson then walked back to Hall's house. Deputy Dillard had spoken to Hall's sister-in-law, and based on that conversation, the deputies decided to speak to Petitioner again. As they walked back towards Petitioner's house, Petitioner approached the officers from the woods behind his house. When Deputy Dillard mentioned the property dispute, Petitioner "chuckled," and remarked that Hall was a liar, and pointed to some cut pipes, for which he suspected Hall was responsible. Initially, Petitioner told Deputy Dillard that he saw Hall a month earlier, but later Petitioner said that he had seen Hall the previous Sunday.

While Deputy Dillard was talking with Petitioner, Deputy Watson walked up the path to a fire pit behind Petitioner's house. There was a medium-sized couch in fairly good condition on fire. It was lying upside down on top of different sized pieces of lumber. As Deputy Watson walked around the fire, he saw an unusual peach-colored object. He poked it with a stick and it seemed solid, spongy and juicy. Petitioner came jogging up the trail, picked up a hose, and began spraying water on the fire. The water increased the smoke and made it harder to see. Deputy Watson told Petitioner to stop watering the fire and to move the couch a little. After Petitioner attempted half-heartedly to move the couch, Deputy

1  Watson suggested that he use a piece of wood. Petitioner moved the couch about an inch and threw the
2  piece of wood on the ground. Deputy Watson took another look at the object and discovered that it was a
3  human arm. Deputy Watson immediately drew his handgun, pointed it at Petitioner, and said, "I'm sorry if
4  I'm wrong about what I thought I just saw, but let me see your hands." Petitioner responded, "Before you
5  go any further, it is what you think it is." Deputy Watson told Deputy Dillard to handcuff Petitioner and
6  radioed for assistance from the coroner, a crime scene investigator, and the fire department.

   After the fire was extinguished, firefighters removed Hall's body from the fire pit. More than half of
Hall's body was severely burned. There was also a metal thermos in the pit. An arson investigator
estimated that the body had been placed on the fire at about 1 p.m.

   In the culvert near the driveway, there was a rock with Hall's blood. The culvert was
approximately 40 to 50 feet from Petitioner's front porch and 50 feet from Hall's garage. A piece of
particleboard close to the garage had a bullet hole in it, with a trajectory coming from the direction of
Petitioner's house towards Hall's garage.

   On November 21, 1998, with the aid of a search warrant, officers searched Petitioner's residence.
The officers found a Ruger .44 caliber revolver made of stainless steel with a scope in a locked case in a
back storage room. There was ammunition for the weapon inside a dresser in the living room.

   Dr. Richard Mason ("Dr. Mason"), a forensic pathologist and expert in wound ballistics with the
coroner's office, performed Hall's autopsy and testified for the prosecution. The body was badly burned,
with about 50 percent of the body tissue destroyed and 80 to 85 percent of the skin burned away.
Portions of the intestines and liver were exposed. The pelvis and legs were badly charred and parts of both
legs were missing.

   Dr. Mason testified that the cause of death was multiple, blunt wounds to both sides of the head.
According to Dr. Mason, Petitioner's Ruger revolver was consistent with Hall's injuries based on the
shape, size and appearance of the wounds, the gun's material, and the diameter of the barrel. Bits of Hall's
tissue and blood were on the muzzle of the weapon. There was also blood on the barrel of the sight. Soil
and blood were inside the front sight base. All of the lacerations to the head went through the full thickness
of skin to bone. The blows to the face were of such force that one or two of them would have knocked

1   Hall to the ground.  Soil found in the revolver was explained by the fact that the other blows occurred while
2   Hall was on the ground.

3   Dr. Mason also found a bullet wound to the liver that was consistent with a .44 caliber gunshot
4   wound.  He could not determine whether Hall was standing or lying on the ground when he was shot.
5   However, based on the absence of blood in the liver along the bullet track, he believed that Hall was near
6   death when he was shot. The gunshot could also have been fatal.

7   Dr. Robert Lawrence ("Dr. Lawrence"), a forensic pathologist, testified for the defense that it was
8   not possible to determine whether Hall's gunshot wound was sustained before or after death.  He based his
9   conclusion on the condition of the liver, the effect of the burning of Hall's body, and the fact that some
10  individual's livers do not bleed even when they are alive.  Dr. Lawrence slightly favored the view that the
11  shot occurred before death.

12  At trial, Petitioner testified that he never intended to kill Hall, and had only wanted to a peaceful
13  solution to their dispute.  He expressed strong remorse for what he had done.

## DISCUSSION

**I.    Standard of Review**

16  Petitioner filed his petition for writ of habeas corpus in this Court on August 8, 2003, and filed his
17  amended petition for habeas corpus on May 21, 2004.  Accordingly, this case is governed by the
18  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposes a "new constraint on
19  the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus."
20  Williams v. Taylor, 529 U.S. 362, 412 (2000).  Under the AEDPA, a district court may entertain a petition
21  for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only
22  on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."
23  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits
24  in state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary to, or
25  involved an unreasonable application of, clearly established Federal law, as determined by the Supreme
26  Court of the Untied States; or (2) resulted in a decision that was based on an unreasonable determination of
27  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state court decision." Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Alvarado v. Hill, 252 F.3d 1066, 1068-9 (9th Cir. 2001). Section 2254(1) "restricts the source of clearly established law to the [Supreme] Court's jurisprudence." Williams, 529 U.S. at 412.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. "Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 412-13.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The objectively unreasonable standard is not a clear error standard. See Andrade, 538, U.S. at 63 (rejecting the Ninth Circuit's use of clear error standard in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)). After Andrade, "[t]he writ may not issue simply because, in [the federal habeas court's] determination, a [s]tate court's application of federal law was erroneous, clearly or otherwise." Id. at 75-76. While the "objectively unreasonable" standard is not self-explanatory, at a minimum "it denotes a greater degree of deference to the state courts than the [Ninth Circuit] ha[s] previously afforded them." Id. at 75.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state-court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of

8

correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. See Sumner v. Mata, 449 U.S. 539, 546-47 (1981); see also Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir. 2001).

Where, as in this writ, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 (9th Cir. 2000) (citation omitted), cert. denied, 354 U.S. 944 (2001) (the district court "looks through" the unexplained California Supreme Court decision to the last reasoned state court decision). The California Court of Appeal rendered the last reasoned state court decision in Petitioner's case.

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)). Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual" prejudice. Brecht, 507 U.S. at 637.

## II.  Legal Claims

### A.  Petitioner's ineffective assistance of counsel claim fails because Petitioner has failed to show that he was prejudiced by his counsels' deficient performance.

#### I.  Background

Petitioner alleges that he was denied effective assistance of counsel because his counsel failed to present four witnesses at trial: Mike Moreland; Kari Sigmund; Peter Sigmund; and John Stephens. Petitioner alleges that these witnesses could have corroborated his testimony that he had been told Hall owned guns. To this end, Petitioner has provided declarations from the four individuals stating what they would have claimed on the stand. Additionally, Petitioner provides a declaration from his trial counsel Nedra Ruiz, who declares "[w]hile it is always possible I misunderstood the scope of the trial court's ruling, we did not have a tactical reason for failing to introduce evidence that [Petitioner] knew Mr. Hall had guns." (Ex. G, Decl. of Nedra Ruiz.)

9

### ii. **Applicable Federal Law**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. The right to effective assistance of counsel applies to performance of both retained and appointed counsel without distinction. See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

In order to prevail on an ineffective assistance of counsel claim, Petitioner must establish two elements. First, counsel's performance was deficient, meaning, that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687-88. Secondly, Petitioner must establish that he was prejudiced by counsel's deficient performance, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

Under Strickland, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Id. at 697. Under the guidance of these established legal standards, the Court turns directly to the second prong of the Strickland test.

### iii. **Analysis**

Petitioner argues that witnesses Mike Moreland, Kari Sigmund, Peter Sigmund, and Jon Stephens would have been able to fill a critical gap in the defense case had they been called to testify. Petitioner contends this gap was created by trial counsel's failure to comprehend a ruling by the trial judge and this failure directly impacted Petitioner's ability to present to the jury his state of mind on the day in question. One of Petitioner's trial counsel, Nedra Ruiz, now acknowledges in a declaration that the court would have allowed these witnesses to testify for the purpose of corroborating Petitioner's testimony regarding Hall's

gun ownership. She also declares that there was no strategic reason for not calling these witnesses. However, it is Petitioner's own words that undermine his claim of prejudice with regard to the issue of his state of mind, not counsels' failure to comprehend the trial court's ruling.

While testifying under oath on direct examination, Petitioner described his confrontation with Hall. He noted that upon realizing Hall was carrying a thermos and not a gun, he thought: "whoa there, you know, . . . I've just played into his hand. Here I am, I shout at him, he's not armed, I'm toast." (Ex. B, RT 3368.) He further clarified his state of mind at the time of the incident when he testified:

> "And then it hit. Then I've got the picture in my mind, you know, so not only did I just play into his hands, you know, he's in the right, I'm in the wrong, because I've got the gun. Not only that, he can now kill me and just walk away and go to work. And that's - - that was when I realized, yeah, this really is - - I really am fighting for my life here. This is not - - you know, this isn't something we're going to like walk away from and have a little lawsuit later. This is real, this is right now."

(Ex. B, RT 3370.)

Any lack of corroborating testimony regarding Hall's ownership of guns did not prejudice Petitioner in light of his own testimony. Petitioner has not shown that there was a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. Nor has Petitioner demonstrated that the conviction resulted in a breakdown in the adversary process rendering the result unreliable.

Accordingly, Petitioner has not shown prejudice under the Strickland standard. Petitioner has failed to establish that he is entitled to habeas relief on the basis of ineffective assistance of counsel.

**B.    Petitioner's claim that his Fifth and Sixth Amendment rights were violated because the trial court improperly excluded evidence fails because the factfinding process was intrinsically reasonable.**

**i.    Background**

Petitioner contends excluding the testimony of Mike Moreland and Peter Sigmund that Petitioner knew Hall owned guns violated his Fifth and Sixth Amendment rights. Petitioner argues that proof of his credibility was crucial to his defense and that testimony from these witnesses would have corroborated his own testimony that Petitioner knew Hall owned guns, thereby bolstering his credibility before the jury.

11

### ii. **Applicable Federal Law**

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds even where it appears that its admission violated fundamental due process and the right to a fair trial. See Henry, 197 F.3d at 1031. The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. See Jammal, 926 F.2d at 920.

Section 2254(d)(2) applies to intrinsic review of a state court's process, or situations in which the petitioner challenges the state court's findings based entirely on the state court record, whereas section 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. See Taylor, 366 F.3d at 999-1000. In Taylor, the Ninth Circuit established a two-part analysis under section 2254(d)(2) and (e)(1). First, federal courts must undertake an "intrinsic review" of the state court's factfinding process under the "unreasonable determination" clause of section 2254(d)(2). Id. at 1000. The intrinsic review requires federal courts to examine the state court's factfinding process, not its findings. "Once the state court's factfinding process survives this intrinsic review – or in those cases where [the] petitioner does not raise an intrinsic challenge to the facts as found by the state court – the state court's findings are dressed in a presumption of correctness . . . ." Id. The relevant question under § 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the state court findings are supported by the record. Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004.)

12

### iii. Analysis

Petitioner challenges the state court's findings based on the state court record, therefore, this Court will conduct its analysis under Section 2254(d)(2) and undertake an "intrinsic" review of the state court's process. After a careful review of the record and relevant cases, the Court is satisfied that the Appellate Court's conclusion was not objectively unreasonable when it determined that the trial court did not abuse its discretion in excluding testimony pertaining to Hall's gun ownership.

Before trial, the prosecution filed a motion in limine to exclude, as irrelevant, testimony from Peter Sigmund that two years before the killing of Hall, in August 1996, he saw a revolver in a drawer in Hall's home. The prosecutor also moved to exclude a statement of Mike Moreland that "he saw Hall shoot a rattlesnake with a .22 in the past." (Ex. A, CT 419, 439.)

The trial court asked Petitioner's counsel whether any of the information that was the subject of the State's motion was known to Petitioner. (Ex. B, RT 520.) Petitioner's counsel, J. Tony Serra, responded, "[Y]ou have to wait until my client testifies." (Ex. B, RT 521.) With the understanding that the issue could be revisited, the trial court granted the prosecutor's motion to exclude reference to Hall's ownership of a gun and his shooting of the snake. (Id.)

The Court finds that the state court's adjudication of the claim resulted in a decision that was based on a reasonable determination of the facts in light of the evidence presented in the State court proceeding. See 28 U.S.C. § 2254(d)(2). In Petitioner's case, the Appellate Court reviewed his claim and the trial court's comments to determine that "the trial court did not abuse its discretion in excluding evidence that Hall had a gun collection . . . . [Petitioner's] belief was based on his neighbors reports. Whether Hall actually possessed weapons was irrelevant to [Petitioner's] belief. Even if Hall had no weapons, this fact would not have affected [Petitioner's] belief." (Ex. E at 24-25.)

The state Appellate Court also determined that assuming, arguendo, there was error, it was harmless. "Any corroboration from the Sigmunds or other evidence that Hall possessed weapons would have been cumulative." (Ex. E at 24-26.) Ultimately, the Appellate Court determined that Petitioner failed to satisfy his burden of demonstrating actual prejudice from the excluded testimony and affirmed the trial

13

1  court's order denying a new trial.  This Court concludes that Petitioner had a full, fair and complete

2  opportunity to present evidence in support of his claims to the state courts, of which he took full advantage.

3  Therefore, the Court finds that the Appellate Court's factfinding process was intrinsically reasonable.

4        Upon finding that the Appellate Court's factfinding process survives an intrinsic review, the Court

5  now turns to the Appellate Court's determination of the facts which is "dressed in a presumption of

6  correctness."  Taylor, 366 F.2d at 1000.  The Appellate Court's factual finding that testimony regarding

7  Hall's gun ownership from the proposed witnesses was "irrelevant" to Petitioner's state of mind and that

8  "[a]ny corroboration from the Sigmunds or other evidence that Hall possessed weapons would have been

9  cumulative," are presumed correct under section 2254(e)(1) unless rebutted by clear and convincing

10  evidence.  (Ex. E at 26.)

11        To rebut that presumption, Petitioner contends that the state Appellate Court did not discuss that:

12  (1) Petitioner was the only witness to present evidence on his state of mind at the time of the shooting, (2)

13  the excluded evidence fully corroborated Petitioner's own testimony that the reason he knew Hall had guns

14  was because his neighbors – the Morelands and the Sigmunds – told him Hall had guns, or (3) the

15  witnesses offered by Petitioner were the very same witnesses Petitioner referred to in his testimony. Yet,

16  the trial court only excluded testimony that Hall owned guns, not that Petitioner knew Hall had guns.

17  Moreland and Sigmund, who were called to testify by the prosecution, could have spoken to that issue.

18  They did not.

19        Petitioner has not presented evidence that rises to the level of clear and convincing evidence

20  sufficient to rebut the presumption of correctness.  Id.  Therefore, the Court concludes that the Appellate

21  Court's decision was not "objectively unreasonable."

22        Accordingly, Petitioner is not entitled to habeas relief on his claim that his Fifth and Sixth

23  Amendment rights were violated by the trial court's exclusion of testimony pertaining to Hall's gun

24  ownership.

25  //

26

27

14

1  **C.  Petitioner's claim that the Prosecutor committed prejudicial misconduct fails because the Prosecutor's statements did not have a substantial and injurious affect on the proceedings and did not render Petitioner's trial fundamentally unfair.**

### i.  Background

Petitioner contends that the Prosecutor committed prejudicial misconduct when she urged the jury to convict Petitioner in part because he had presented no evidence supporting (1) his own testimony that Hall owned guns or (2) his claim that Hall was stalking him.  Petitioner notes that there was no evidence on these points precisely because the Prosecutor had kept it out by objection and argues that the Prosecutor's comments on that lack of evidence before the jury violated due process.

### ii.  Applicable Federal Law

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); see Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").  Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted, cert. denied, 516 U.S. 1017 (1995)).  Under the AEDPA, the state court's disposition will not be disturbed unless there has been an unreasonable application of Supreme Court precedent, or that the state court's decision has unreasonably applied the facts as presented at the state court trial.  Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999).

The first factor in determining the prejudicial effects of misconduct is whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  See Greer v. Miller, 483 U.S. 756, 755 n.8 (1987).  This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant.  See Greer, 483 U.S. at 766 n.8.

15

Other factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, compare United States v. Young, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, see Darden, 477 U.S. at 182.

A court will also examine whether the defense invited the error. While a prosecutor may fairly rebut defense counsel's contentions, the prosecution is not entitled to use improper tactics in response of defense counsel. See United States v. Bagley, 772 F.2d 482, 494 (9th Cir. 1985), cert. denied, 475 U.S. 1023 (1986); also Young, 470 U.S. at 7. However, in deciding whether due process is violated, a court will look to the fairness of the trial, not the conduct of the defendant. See United States v. Agur, 427 U.S. 97, 110 (1976). Therefore, where a prosecutor responds no more than necessary to "right the scale" unbalanced by defense use of improper tactics, such comments would not warrant reversal. See Young, 470 U.S. at 12-13 (reviewing court must weigh the impact of the prosecutor's remarks and take into account defense counsel's opening salvo). "A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation will draw that meaning from a plethora of less damaging interpretations." Williams v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) (citing Donnelly v. DeChristoforo, 616, U.S. 637, 647 (1974)). In determining whether a due process violation occurred, the arguments of counsel are generally accorded less weight by the jury than the court's instructions and must be judged in the context of the entire argument and the instructions. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 898 (9th Cir. 1996).

16

### iii. Analysis

Petitioner points to five examples of alleged prosecutorial misconduct, four of which were statements made by the Prosecutor during closing argument that pertained to Hall's gun ownership and one which pertained to Hall's stalking of Petitioner.

#### 1. Hall's Ownership of Guns

A review of the record shows that when the Prosecutor stated, "How reasonable is that contention?" during closing argument, she did so in response to argument by Petitioner's counsel, J. Tony Serra. Such a rebuttal was within constitutionally permissible bounds, as opposing counsel opened the door.

As for the three remaining examples of Hall's gun ownership, as presented by Petitioner, they must be reviewed in the context of the entire argument. For example, though Petitioner takes umbrage with the Prosecutor's use of the phrase "entirely questionable," a review of the record shows that the Prosecutor was commenting on Petitioner's failure to mention the gun collection on direct examination and the lack of facts surrounding the snake-shooting incident personally known to Petitioner. (Ex. B, RT 4763.) The Prosecutor noted that Petitioner did not see the gun on that day and did not know what type of gun it was. Further, she noted that the incident was a couple of years earlier and nobody was threatened but the snake.

A review of the records shows that the word "ludicrous," and the phrase "no basis on which a reasonable person would think he had a gun," were not acts of affirmative reliance on the failure of the defense to introduce evidence that the court had specifically excluded on the Prosecutor's own motion. (See Ex. B, RT 4779; Ex. B, 4777.) They were, in fact, respectively, comments on (1) the lack of the "assaultive" nature of the victim, who was walking away from Petitioner prior to being shot at, and (2) whether it was reasonable to charge at a man believed to have a gun.

#### 2. Hall's Stalking of Petitioner

With respect to the claim that the mail theft was not evidence of stalking, the Prosecutor's words were again in response to Petitioner's trial counsel, who directly addressed the subject in closing argument. Again, this rebuttal was within constitutionally permissible bounds.

17

In light of the established legal standards discussed previously, this Court must consider the context in which the words or phrases were presented to the jury. Based on a review of the record as a whole, the Court finds that the Prosecutor's closing arguments did not have a substantial and injurious affect on the proceedings and did not render Petitioner's trial fundamentally unfair. See Williams v. Borg, 139 F.3d at 745.

Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on the claim of prejudicial prosecutorial misconduct.

## **CONCLUSION**

The Court finds that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings. Accordingly, the petition for writ of habeas corpus is DENIED.

Dated:  November 2, 2005 　　　　　　　　　　　　/s/ James Ware　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　JAMES WARE
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN MAILED TO:**

Cliff Gardner, casetris@aol.com
Lazuli Mariah Whitt, lazuli@sbcglobal.net
Morris Lenk, morris.lenk@doj.ca.gov
Peggy S. Ruffra, peggy.ruffra@doj.ca.gov

**Dated: November 2, 2005**          **Richard W. Wieking, Clerk**

                                     **By:       /s/ JW Chambers**
                                           **Ronald L. Davis**
                                           **Courtroom Deputy**

**United States District Court**
For the Northern District of California